PEOPLE v GONZALES

Docket No. 67765. Argued June 8, 1982 (Calendar No. 3).—Decided
    December 23, 1982.

Salvadore Gonzales was convicted by a jury in the Oakland
    Circuit Court, John N. O'Brien, J., of first-degree murder. The
    Court of Appeals, Cynar, P.J., and Bronson and D. F. Walsh,
    JJ., reversed, holding that the admission of testimony of a
    witness whose memory had been refreshed by hypnosis was
    error (Docket No. 51316). The people appeal.

In an opinion by Justice Kavanagh, joined by Chief Justice
    Fitzgerald and Justices Williams, Levin, Coleman, and Ryan,
    the Supreme Court held:

Hypnosis is not a reliable means of accurately restoring
    forgotten incidents or repressed memory. Testimony by a wit-
    ness whose memory has been refreshed by hypnosis denies a
    defendant the right to cross-examine the witness adequately
    and must be excluded in criminal cases.

1. Admissible scientific evidence is limited to the results of
    techniques which have gained general acceptance in their
    particular fields. Hypnotic enhancement of memory has not
    gained sufficient scientific recognition of reliability to allow
    admission of the posthypnotic recollections of witnesses. Hypno-
    sis does more than permit a witness to retrieve real, but
    repressed, memories; it actively contributes to the formation of
    pseudomemories and the inability of the witness to distinguish
    between the two.

2. The hypnotic state is a condition of altered consciousness
    marked by heightened suggestibility. A hypnotized subject is
    highly susceptible to suggestion, even suggestion which is sub-
    tle and unintended. Such suggestion may be impressed on the
    subject during or before hypnosis, convincing him that the
    suggested events were actually recalled. The subject's convic-
    tion that such induced recollections are absolutely true grows
    stronger each time they are repeated. Neither the subject nor

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 29 Am Jur 2d, Evidence § 831.7
    Admissibility of hynotic evidence at criminal trial. 92 ALR3d 442.

an expert observer can distinguish between truth and fantasy. Introduction of such testimony would deny a defendant the opportunity to cross-examine the witness adequately.

3. Hypnosis may be used as a tool of investigation. A party could preserve a witness's testimony by deposition before he undergoes hypnosis. After hypnosis, the witness would be considered unavailable.

Affirmed.

108 Mich App 145; 310 NW2d 306 (1981) affirmed.

1. CRIMINAL LAW — WITNESSES — HYPNOSIS — CROSS-EXAMINATION.

Testimony by a witness whose memory has been refreshed by hypnosis denies a defendant the right to cross-examine the witness adequately and must be excluded in criminal cases.

2. CRIMINAL LAW — WITNESSES — HYPNOSIS — PSEUDOMEMORIES.

Hypnosis, rather than merely enhancing memory by permitting a witness to retrieve real, but repressed, memories, actively contributes to the formation of pseudomemories which neither the witness nor anyone else can distinguish from real memories; such pseudomemories can result from suggestion before or during hypnosis, even suggestion which is subtle or unintended, or from the subject's compelling desire to please those seeking the information and are perceived by the subject as true, the conviction growing stronger each time the memory is repeated.

3. CRIMINAL LAW — SCIENTIFIC EVIDENCE — HYPNOSIS.

The admission of scientific evidence is limited to results of techniques which have gained general acceptance in their particular fields; hypnotic enhancement of memory has not gained sufficient scientific recognition of reliability to allow admission of the posthypnotic recollections of witnesses.

4. CRIMINAL LAW — WITNESSES — HYPNOSIS — PRESERVING TESTIMONY.

Hypnosis may be used as a tool of investigation; testimony of a witness could be taken by deposition before hypnosis and preserved for trial, but after hypnosis, the subject would be unavailable as a witness (MRE 804[b][1]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Geoffrey H. Nickol,* Assistant Prosecuting Attorney, for the people.

*Curtis G. Rundell, II, P.C.,* for the defendant.

Amicus Curiae:

*Terence R. Flanagan* for the State Appellate Defender and The Criminal Defense Attorneys of Michigan.

KAVANAGH, J. Defendant Salvadore Gonzales and John Duncan Wallach were charged with the first-degree murder of Elmer Evans.[1] Gonzales and Wallach were tried separately. Following a jury trial defendant was found guilty as charged and sentenced to a mandatory term of life imprisonment. The Court of Appeals reversed his conviction, holding that the trial court erred in admitting the testimony of a witness whose memory had been hypnotically refreshed.[2] We affirm the opinion of the Court of Appeals for the reasons stated therein and for the additional reasons set forth below.

I

The case against defendant was based almost solely on the testimony of Rhonna Burns, summarized by the Court of Appeals:

"According to the testimony of Burns, on Saturday night, January 27, 1979, she was at the Liberty Bar with John Wallach. Late that evening Wallach introduced her to defendant. Wallach then went over to Elmer Evans while Burns and defendant conversed. After talking to Evans, Wallach came back to the booth where Burns and defendant were. He said that Evans needed a ride home. Defendant then went over to Evans who gave defendant his car keys. Defendant then left

[1] MCL 750.316; MSA 28.548.

[2] *People v Gonzales,* 108 Mich App 145; 310 NW2d 306 (1981).

by way of the front door—apparently to go to Evans' car which Evans had said was parked in front of the bar. Wallach, Burns, and Evans exited through the back door of the bar and went to Wallach's station wagon. The trio drove to a warehouse. Defendant was waiting there, standing in front of a small blue car. Defendant got into the back seat of the station wagon and sat next to Evans. They then drove to a house on a hill and stopped in front of a garage. Stating that he had to go to the bathroom, defendant got out and went out around the garage toward the right. Wallach and Evans then got out of the car and went toward the left, out of Burns' view. After approximately 10 or 20 minutes, defendant returned. Wallach returned immediately thereafter. Evans, however, did not return. Wallach's right hand was cut and blood was on his hand and pants. Burns and Wallach then dropped defendant off downtown." 108 Mich App 145, 147-148; 310 NW2d 306 (1981).

Rhonna Burns' memory had been hypnotically refreshed prior to trial and was admitted over defendant's objections that the hypnosis may very well have irreparably tainted her true memory so that she was merely parroting suggestions implanted by the police. A review of the events preceding the trial illustrates the fact that defendant's objections were well-founded.

On March 5, 1979, Detectives Werner and Thompson of the Waterford Police Department conducted the first interview with Rhonna Burns. She conveyed the following description of the events of Saturday, January 27, 1979. At around 10 o'clock that morning, she and John Wallach went to the Liberty Bar. Shortly after their arrival, John left the bar with Fred Torres and a man named Chico. She remained at the bar and watched television. When John returned to the bar she went out to his car and fell asleep. Shortly thereafter John came out and fell asleep in the

car. Detective Werner asked Rhonna if she and John had given anybody a ride home. She said that they had dropped off someone at Voorheis Road, but she did not remember where or whom. The police drove Ms. Burns to Chico's house located on Voorheis, and she identified it as the house where she and John Wallach had dropped someone off. She also remembered giving someone else a ride that night. The police asked Rhonna if she remembered John Wallach being covered with blood when he came back to the bar to pick her up that night, and she replied no.

On March 13, 1979, Detectives Werner and West conducted a second interview with Rhonna Burns. At this interview Ms. Burns reiterated substantially the same story.

On March 29, 1979, Detective Werner and Sergeant Dorrance conducted a third interview with Rhonna Burns. Initially, Ms. Burns failed to remember anything new about the night in question. Detective Werner asked Burns if she saw defendant at the Liberty Bar on the night of January 27, 1979. Burns replied she did not remember seeing him. Burns remembered Wallach stating that he was going to give Fred Torres and Chico a ride to the Wide Track Bar. She then remembered Wallach coming back to the bar and sitting in the booth with her. Detective Werner asked her if the defendant was sitting in the booth with her and John, and she replied that she did not remember. She then recalled that Wallach pointed to an old man sitting at the back of the bar, and said they should give him a ride home because he was drunk. She, Wallach, and the old man left the bar together, and they drove the old man home. Burns could not remember if they met anyone at the old man's house. After dropping him off they met

Chico and drove him home. She and Wallach then returned to the Liberty Bar where Wallach left her alone for a while.

Detective Werner and Sergeant Dorrance left, but returned later to show Burns some photographs. They showed her photographs of Elmer Evans, but Burns was not sure that he was the same old man that she and Wallach had taken home. When asked if she knew where the old man lived, Burns described a big, new house with dark siding. This description fit the house located at 2610 Silver Down Court where Evans' body had been found. Burns subsequently identified a picture of the house at 2610 Silver Down Court and said it looked like the house at which the old man had been dropped off. Werner then asked Burns if she had returned to this house at 5 a.m. on Sunday, January 28, and if she got out of the car, saw some bodies, and screamed. She replied that she could have, but that she did not remember. Either during or prior to this interview, Officer Werner told Burns that defendant was short, stocky, and of Mexican or Spanish descent. At some point in this interview, Werner showed Burns a photograph of defendant and asked her if she had seen him in the Liberty Bar. Burns still did not remember defendant being at the Liberty Bar.

Detective Werner held a fourth interview with Rhonna Burns on April 3, 1979. For the first time Burns remembered defendant sitting at the bar with her and Wallach on the night of January 27, 1979. She also remembered Wallach and defendant walking up to the old man and asking him if they could give him a ride home. The old man gave defendant his car keys. Burns, Wallach, and the old man left the bar together and picked up defen-

dant on the way to what Burns believed to be the old man's house. Both Wallach and defendant helped the old man out of the car and to the house. Wallach, Burns, and defendant then drove back to the Liberty Bar, picking up Chico along the way and dropping him off at home. When they arrived at the bar, Wallach and defendant got out of the car and left Burns there to sleep. Burns said that later Wallach came back to the car and the two of them drove to Tina Meston's house. Officer Werner asked Burns whether she remembered Wallach picking up a shovel at Tina's and putting it in the car. Burns replied yes. When asked whether she and Wallach drove back to the old man's house so he could cover the bodies, and whether she got out of the car and saw the bodies and screamed, she answered that she must have seen the bodies to scream but that she could not remember surely. She was then asked if she saw Wallach cover the bodies with snow using the shovel, and she answered that she could have, but that she did not think so. At this interview, Burns consented to Officer Werner's request that she undergo hypnosis to improve her memory.

On April 13, 1979, Werner and another officer picked up Burns to drive her to Lansing for the hypnosis session. En route, the officers drove Burns to the murder scene, where she stated that this was where she and Wallach had driven the old man. While walking around the grounds, she remembered various details of the night in question. The officers then drove Burns to the Crescent Machine Company where Evans' car was found. Burns was not sure that this was the area where they had picked up defendant on the evening in question. They then proceeded to Lansing, where Dr. Donald Rossi, Director of Behavioral Sciences

for the Michigan Department of State Police, conducted the hypnosis session.

It is obvious that by the time Rhonna Burns was hypnotized by Dr. Rossi, the various interviews conducted by the police had already suggested to her their theory of the killing.

## II

In *People v Tobey,* 401 Mich 141, 145; 257 NW2d 537 (1977), we reaffirmed our adherence to the rule of *Frye v United States,* 54 US App DC 46, 47; 293 F 1013, 1014 (1923), limiting the admission of scientific evidence to techniques which have gained general acceptance in the particular areas in which they belong. In determining the admissibility of the testimony of a witness whose memory had been hypnotically refreshed, the Court of Appeals employed the *Frye* test. The prosecutor contends that the *Frye* rule is inapplicable in this context, because the rule is concerned only with the admissibility of expert opinion deduced from the results of lie detector tests, truth serums, drunkenness tests, and narcotics tests. The prosecutor also contends that hypnosis is one of many methods of refreshing recollection, like reviewing notes. We find these arguments unpersuasive. Hypnotizing a witness to improve his memory is not in fact like any other method of refreshing a witness's recollection. As the California Supreme Court pointed out in *People v Shirley,* 31 Cal 3d 18, 53; 181 Cal Rptr 243, 264; 641 P2d 775, 795 (1982), *cert den* 458 US 1125; 103 S Ct 133; 74 L Ed 2d 114 (1982),

"[T]he hypnotic process does more than permit the witness to retrieve real but repressed memories; it actively contributes to the formation of pseudomemories, to the witness' abiding belief in their veracity, and

to the inability of the witness (or anyone else) to distinguish between the two."[3]

The prosecutor's argument that the *Frye* rule is inapplicable proceeds from an unduly narrow reading of the opinions invoking the *Frye* rule. The purpose of this rule is to prevent the jury from relying on unproven and ultimately unsound scientific methods. The technique of hypnosis is scientific, and the testimony of the witness is the product of the use of the technique. The induced recall of the witness is dependent upon and cannot be disassociated from the underlying scientific method.[4] Accordingly, we conclude that the Court of Appeals was correct in applying the *Frye* test in the instant case.

In its opinion, the Court of Appeals reviews the literature and case law available on this subject. There is no need to repeat here the exhaustive summary of articles on the use of hypnosis to refresh recollection. At this point, we need make only the following observations by way of summary. The hypnotic state is a condition of altered consciousness marked by heightened suggestibility. A subject in a hypnotic state may not have accurate recall. A hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended. Such suggestion may be transmitted either during the hypnotic session or before it by such persons as, in this case, the policemen inves-

[3] See 108 Mich App 158, fn 7.

[4] *Polk v State,* 48 Md App 382, 394; 427 A2d 1041 (1981). Many other courts have applied the *Frye* test to the issues surrounding admission of hypnotically induced recall. See, *e.g., State v Mena,* 128 Ariz 226, 231; 624 P2d 1274 (1981); *People v Shirley,* 31 Cal 3d 18, 51; 181 Cal Rptr 243, 263; 641 P2d 775 (1982), *cert den* 458 US 1125; 103 S Ct 133; 74 L Ed 2d 114 (1982); *State v Mack,* 292 NW2d 764, 771 (Minn, 1980); *State v Palmer,* 210 Neb 206; 313 NW2d 648, 655 (1981); *Commonwealth v Nazarovitch,* 496 Pa 97; 436 A2d 170, 171-178 (1981).

tigating the killing. The person under hypnosis experiences a compelling desire to please either the hypnotist or others who have asked the person hypnotized to remember or who have urged that it is important that he or she remember certain events. The subject may produce the particular responses he believes are expected of him.[5] In this state of hypersuggestibility and hypercompliance the subject will unconsciously create answers to the questions which the hypnotist asks if he cannot recount the details being sought. This process of filling the gaps of memory with fantasy is called confabulation. Neither the person hypnotized nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. Finally, a witness who is uncertain of his recollections before being hypnotized will become convinced through the process that the story he told under hypnosis is true and correct in every respect. This effect not only persists, but the witness's conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story.

Despite the problems associated with hypnotically refreshed or created memory, at present the majority of jurisdictions which have considered the question have allowed the testimony of one who has had his memory "refreshed" through hypnosis. Some courts have held that such testimony is admissible only if stringent safeguards are followed, *State v Hurd*, 86 NJ 525; 432 A2d 86 (1981), being the leading case in this area. Nonetheless,

---

[5] Rhonna Burns agreed to undergo hypnosis at the request of the police. The officers investigating the murder accompanied Rhonna to the hypnosis session and remained in the room with her throughout the session. Burns admitted that she was frightened by the police. They had told her that if she didn't "come up with something" she could be put in isolation.

the Court of Appeals did not believe that even the *Hurd* standards provide sufficient safeguards.[6]

"While the *Hurd* standards would have the tendency to minimize distortion due to hypnotic suggestibility, our examination of the literature convinces us that, even following these criteria, substantial problems with confabulation, fantasy, and distortion would remain. Consequently, in individual cases, the *Hurd* standards might have an affirmatively detrimental effect. The standards, themselves, would give the hypnotic process an aura of reliability which, in actuality, it does not possess. It is far too likely that a jury would be even less critical of the testimony because of the indicia of reliability provided by such standards." 108 Mich App 159-160.[7]

---

[6] The *Hurd* standards set forth by the New Jersey Superior Court are:

" '(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.

" '(2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.

" '(3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.

" '(4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.

" '(5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.

" '(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.' *State v Hurd,* 173 NJ Super 333, 363; 414 A2d 291 (1980).

"In *Hurd,* the court ultimately ruled that the state had not met its burden of showing that the standards had been complied with. Consequently, it granted defendant's motion to suppress a witness's identification which could not be made until she had submitted to a pretrial hypnotic procedure." 108 Mich App 159.

[7] In *People v Shirley, supra,* the Supreme Court of California

The Court of Appeals concluded that hypnosis as a technique to enhance memory recall has not received sufficient scientific recognition of reliability to allow the posthypnotic "recollections" of witnesses to be introduced into evidence. This conclusion is reinforced by the recent trend of authority which holds that the use of such testimony is so fraught with danger that its admission is prohibited. See *People v Shirley, supra; Strong v State,* 435 NE2d 969 (Ind, 1982); *Commonwealth v Nazarovitch,* 496 Pa 97; 436 A2d 170 (1981); *State v Mena,* 128 Ariz 226; 624 P2d 1274 (1981); *People v Palmer,* 210 Neb 206; 313 NW2d 648 (1981); *State v Mack,* 292 NW2d 764 (Minn, 1980). We agree with the conclusion that the process of hypnosis and its outcome is inherently unreliable. Hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the results produced under even the best of circumstances will be sufficiently reliable to outweigh the risks of abuse or prejudice.

## III

The process of hypnosis is not a reliable means of accurately restoring forgotten incidents or re-

pointed out additional reasons why such standards are not sufficient to avoid the risks inherent in admitting hypnotically induced testimony.

"Next, we observe that certain dangers of hypnosis are not even addressed by the *Hurd* requirements: virtually all of those rules are designed to prevent the hypnotist from exploiting the suggestibility of the subject; none will directly avoid the additional risks, recognized elsewhere in *Hurd,* that the subject (1) will lose his critical judgment and begin to credit 'memories' that were formerly viewed as unreliable, (2) will confuse actual recall with confabulation and will be unable to distinguish between the two, and (3) will exhibit an unwarranted confidence in the validity of his ensuing recollection. (432 A2d 93-94.) The Attorney General proposes no 'safeguards' to deal with these knotty problems." 31 Cal 3d 39; 181 Cal Rptr 255; 641 P2d 787.

pressed memory, and to permit posthypnotic testimony would unfairly denigrate the defendant's right to cross-examination. Therefore, we hold that until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy, and until the barriers which hypnosis raises to effective cross-examination are somehow overcome, the testimony of witnesses which has been tainted by hypnosis must be excluded in criminal cases.

We do not foreclose, by this opinion, the use of hypnosis as an extremely useful investigative tool. A party could preserve a witness's prehypnotic testimony by using an MRE 804(b)(1) deposition. After the hypnotic session, the subject would be considered "unavailable as a witness".

Affirmed.

FITZGERALD, C.J., and WILLIAMS, LEVIN, COLEMAN, and RYAN, JJ., concurred with KAVANAGH, J.

RILEY, J., took no part in the decision of this case.

ORDER

Entered on April 25, 1983.—REPORTER.

On order of the Court, the Court on its own motion has reconsidered its opinion in this matter. On reconsideration, it is ordered that the following language be added thereto:

This opinion should not be read as determining the question of the admissibility of this witness's testimony concerning facts she was able to recall and relate prior to hypnosis, a question which is reserved until raised on an adequate record in an appropriate case.