IN THE MATTER OF RINESMITH

Docket No. 78059. Submitted March 20, 1985, at Lansing.—Decided
June 10, 1985. Leave to appeal denied, 424 Mich —.

The Michigan Department of Social Services filed a petition in
Washtenaw Probate Court seeking to have the parental rights
of Rose Williams and Douglas Williams terminated. Evidence
was admitted at the termination proceeding tending to estab-
lish that Angel R. Rinesmith, aged four, had been sexually
abused by her father, Douglas Williams. Following the proceed-
ing, the court, Loren W. Campbell, J., terminated the parental
rights of both Rose Williams and Douglas Williams to Angel
Rinesmith and her younger brother, James R. Rinesmith. Rose
Williams appealed. *Held:*

1. The probate court did not err in its finding that statements
made by Angel Rinesmith to a pediatrician could be admitted
under an exception to the hearsay rule for statements made for
the purpose of medical treatment or diagnosis.

2. It was not error for the probate court to admit testimony
relating to Angel's reaction to an anatomically correct doll. The
use of anatomically correct dolls to elicit responses from chil-
dren who are suspected victims of sexual abuse does not rise to
the level of a scientific test subject to the rule that a test
procedure must achieve general scientific recognition that it is
sufficiently reliable before the results can be admitted into
evidence. Testimony as to Angel's reactions was admissible as a

REFERENCES FOR POINTS IN HEADNOTES

[1] Am Jur 2d, Rape § 55 et seq.
See the annotations in the ALR3d/4th Quick Index under Rape.
[2] Am Jur 2d, Evidence § 769 *et seq.*
See the annotations in the ALR3d/4th Quick Index under Demon-
strative Evidence.
[3] Am Jur 2d, Expert and Opinion Evidence §§ 53-65.
Modern status of the rules regarding use of hypothetical questions
in illiciting opinion of expert witness. 56 ALR3d 300.
[4] Am Jur 2d, Negligence § 377.
Am Jur 2d, Parent and Child §§ 8-25.
Liability of parent for injury to unemancipated child caused by
parent's negligence—modern cases. 6 ALR4th 1066.

foundation for the expert witnesses' opinions that Angel had been sexually abused.

3. The admission of testimony by one of the expert witnesses in response to a hypothetical situation based on statements made by Angel to the pediatrician was proper.

4. Rose Williams's contention that there was insufficient evidence to terminate her parental rights and that the termination of parental rights was based solely on the actions of Douglas Williams is rejected. There was overwhelming evidence that Rose Williams was incapable of properly caring for her children and protecting them from harm. There was clear and convincing evidence to support the termination of Rose Williams's parental rights.

Affirmed.

1. RAPE — INFANTS — EVIDENCE — HEARSAY — STATEMENTS MADE FOR MEDICAL TREATMENT OR DIAGNOSTIC PURPOSES.

Evidence of statements by a four-year-old child to her examining physician that she suffered pain caused by sexual abuse and that that abuse was inflicted by a member of her family were admissible into evidence under the hearsay exception for statements made for the purpose of medical treatment or diagnosis where the child's statements were reasonably necessary to obtain relief (MRE 803.4).

2. EVIDENCE — ANATOMICALLY CORRECT DOLLS.

The use of anatomically correct dolls to elicit responses from children who are suspected victims of sexual abuse does not rise to the level of a scientific test subject to the rule that a test procedure must achieve general scientific recognition that it is sufficiently reliable before the results can be admitted into evidence; testimony as to a child's reaction to an anatomically correct doll may be admissible as a foundation for an expert witness's opinion that the child has been sexually abused.

3. WITNESSES — EXPERT WITNESSES — HYPOTHETICAL QUESTIONS.

An expert witness may base his opinion on facts or data not in evidence; however, where a party examines an expert by the use of hypothetical questions the answers must be based on facts contained in the questions and the hypothetical questions must be premised on facts already in evidence.

4. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — NE-GLECT.

A parent's parental rights may be terminated if the parent is unable to provide a fit home for the child by reason of neglect (MCL 712A.19a[e]; MSA 27.3178[598.19a(e)]).

*William F. Delhey,* Prosecuting Attorney, and *David A. King,* Assistant Prosecuting Attorney, for the Department of Social Services.

*Judith W. Judge,* for respondent.

Before: R. B. BURNS, P.J., and R. M. MAHER and G. R. DENEWETH,* JJ.

PER CURIAM. Respondent Rose Williams (formerly Rinesmith) appeals by leave granted from an order which terminated her parental rights to her minor children, Angel Rinesmith, born August 21, 1978, and James Rinesmith, born February 11, 1980. The children's natural father, Douglas Williams, also a respondent below, does not appeal the termination of his parental rights.

Respondent's claims of error center on the admission of evidence tending to establish that Angel had been sexually abused by her father, Douglas Williams. The first challenge is to the admission of the testimony of Dr. Ellen Daniel, a pediatrician who examined the children.

Daniel testified that on September 1, 1982, prior to her examination of Angel, Angel left the waiting room and stood in the doorway of her office. Angel chatted with Dr. Daniel for a few minutes and then indicated that she had to "go to the potty". Angel asked Dr. Daniel to take her to the bathroom. Since the receptionist was busy, Dr. Daniel agreed. As soon as they got to the bathroom, Angel ran into the corner of the room, put her hands between her legs and told Dr. Daniel that her "pee pee" hurt. Dr. Daniel asked Angel why she was in pain and Angel replied, "Because my daddy puts his penis in it". Dr. Daniel asked Angel, who was then four years old, if she knew

---

* Circuit judge, sitting on the Court of Appeals by assignment.

what a penis was. According to Dr. Daniel, Angel's response was "very adequate". The subsequent physical examination of Angel revealed that she had lost two pounds in the six weeks since her last examination and that her weight was now below the 5th percentile of children her age. The examination also revealed three very obvious bruises on the upper portion of Angel's buttocks. Dr. Daniel found that the pattern of the bruises indicated that the child had been grabbed by an adult and pulled forward. According to Dr. Daniel, the pattern of bruises substantiated the allegation of sexual abuse.

The probate court ruled that Angel's statements to Dr. Daniel that she had been sexually abused by Douglas Williams were hearsay. The probate court held, however, that the statements were admissible under MRE 803(2), the "excited utterance" exception to the hearsay rule, and under MRE 803(4), the exception for statements made for the purpose of medical treatment or diagnosis. Respondent claims this determination was in error.

We agree that the evidence fails to justify admission of evidence of Angel's statements to Dr. Daniel under the excited utterance exception. Although sexual abuse by a parent could certainly be a "startling occasion" so as to produce nervous excitement, there was no proof in the instant case that Angel's statements were made before there was time to contrive and misrepresent or that her statements related to the circumstances of the startling occasion. *People v Kreiner,* 415 Mich 372, 379; 329 NW2d 716 (1982).

Although evidence of Angel's statements to Dr. Daniel could not be properly admitted under MRE 803(2), we hold that the probate court did not err in its finding that evidence of the statements could

be admitted under MRE 803(4). MRE 803(4) provides an exception to the hearsay rule for:

"Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment."

Respondent does not claim that Angel's statements to Dr. Daniel were not made for medical treatment or medical diagnosis. Instead, respondent asserts that the statements were not "reasonably necessary" to make a diagnosis and to treat the child. Respondent also asserts that Angel's pain should be considered "a surface injury" and that, because Dr. Daniel was not operating out of a child abuse clinic, Dr. Daniel's testimony as to Angel's statements could not be properly admitted under the medical treatment exception.

We disagree. Rather than being a mere "surface injury" such as a scratch or a bruise, Angel suffered internal pain. Angel had been brought to Dr. Daniel's office on a prior occasion in the company of her parents and DSS personnel. Angel could, therefore, logically conclude that Dr. Daniel was in a position to help her in regard to physical problems arising out of problems within her family. Angel could look to Dr. Daniel not only to alleviate the immediate pain but to take some action to intervene and prevent the pain from recurring in the future. Viewed in this light, revelation of the fact that the pain was caused by sexual abuse and that that abuse was inflicted by a member of her family was reasonably necessary to obtain relief. See *People v Wilkins,* 134 Mich App 39; 349 NW2d 815 (1984). The probate court did not err in admit-

ting into evidence Dr. Daniel's testimony regarding Angel's statements.

Respondent next contends that it was error to admit testimony relating to Angel's reaction to an anatomically correct doll.

After receiving Dr. Daniel's report of suspected sexual abuse, DSS social workers Sandra Wright and Allison Green visited Angel at her daycare center. They placed male and female anatomically correct dolls in front of Angel. Angel picked up the male doll, stated that it "looked like daddy" and threw the doll across the room. Angel avoided answering any questions put to her by the DSS workers. However, when questioned about what she had told Dr. Daniel, Angel undressed the male doll, put the penis of the doll into her mouth two times, and then put the doll down.

Dr. Kathleen Faller, an expert in the area of child abuse and neglect, testified that she had evaluated the responses of 140 children to the dolls. According to the doctor, this number was clinically significant. She stated that generally children who were thought to have been sexually abused became very upset and angry or afraid of the dolls while playing with them or had the dolls engage in some sexual behavior. Children who were thought to be nonabused were initially curious but soon became bored with the sexual aspect of the dolls. Dr. Faller also testified that the anatomically correct dolls were widely used and accepted tools for detecting possible sexual abuse. She claimed that, in Michigan, Protective Services in all 83 counties and the Michigan State Police had been supplied with and used the dolls.

Respondent asserts that the testing of suspected sexually abused children with anatomically correct dolls is not sufficiently reliable and that, until this procedure achieves general scientific recognition,

neither the results of the interview nor expert evaluation of it should be admitted in legal proceedings.

We disagree. The use of anatomically correct dolls to elicit responses from children who are suspected victims of sexual abuse does not rise to the level of a scientific test subject to the so-called *Davis-Frye* rule.[1] The dolls are not calculated to elicit a particular result but as a tool to permit children to communicate ideas which they are unable to express verbally because they are too young or anxiety-ridden or because they lack the vocabulary.

In the instant case, statements made by Angel to Dr. Daniel indicated the possibility that she had been sexually abused. Angel's violent reaction to the male doll, in the opinions of Sandra Wright, Allison Green, and Dr. Faller, each of whom had been qualified as an expert in the field of child abuse, tended to substantiate Angel's statements. At no time did any of these witnesses testify that Angel's behavior with the doll was conclusive on the issue of sexual abuse. The jury was told that the presence of a strong or violent reaction to the dolls only indicated "potential sexual abuse". Ac-

---

[1] In *Frye v United States,* 54 US App DC 46, 47; 293 F 1013, 1014 (1923), the court held that an expert's conclusion based on a scientific test may be admitted but "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs". In *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955), our Supreme Court similarly acknowledged that because of the tremendous weight the results of "scientific tests" could carry with a jury, the results of such tests were to be admitted into evidence only if the accuracy of such tests had gained general scientific acceptance and standardization. 343 Mich 372.

In *People v Young,* 418 Mich 1; 340 NW2d 805 (1983), the Court refused to limit application of the *Davis-Frye* rule to cases involving solely the admissibility of lie detector tests, truth serums, and alcohol and narcotics tests. Rather, the Court found that the *Davis-Frye* rule should be broadly applied to preclude the jury from relying on improper and ultimately unsound scientific methods.

cordingly, references to Angel's reaction to the dolls was presented simply as an additional factor for the jury to weigh in its determination of whether Angel had been physically and sexually abused, rather than as a conclusive scientific test for establishing the existence of sexual abuse. Consequently, the probate court did not err in ruling that testimony as to Angel's reactions was admissible as a foundation for the expert's opinion that she had been sexually abused.

We also find no error in the admission of the testimony of Dr. Faller, an expert in child abuse. Unlike the doctor in *People v Izzo,* 90 Mich App 727; 282 NW2d 10 (1979), Dr. Faller did not interview Angel nor did she specifically assess Angel's credibility. Rather, Dr. Faller was presented with a hypothetical situation involving the facts presented in the instant case and Angel's statements to Dr. Daniel. It was Dr. Faller's opinion that the 4-year-old girl in the hypothetical situation described had been sexually abused by her father. Dr. Faller stated that under certain circumstances 4-year-olds could make up stories regarding sexual abuse but that these stories generally would not involve explicit sexual knowledge of how "the behavior feels". Since Dr. Faller's opinion was based on a general knowledge of the development and sexual awareness of 4-year-olds and was not an evaluation of Angel's credibility, Dr. Faller's testimony cannot be considered to have usurped the jury's responsibility for determining whether in this particular case the child's statements to a physician should be considered credible.

Furthermore, the fact that the hypothetical situation presented to Dr. Faller included the facts from the instant case does not render Dr. Faller's opinion invalid. In *West v Livingston County Road Comm,* 131 Mich App 63; 345 NW2d 608 (1983),

this Court ruled that when a party examines an expert witness using hypothetical questions, the expert's answer must be based on, and the hypothetical questions must be premised on, facts already in evidence. Consequently, Dr. Faller's testimony in response to a hypothetical situation based on the statements made by Angel to Dr. Daniel was proper.

Finally, respondent contends that, since she did not physically or sexually abuse either Angel or James, the termination of her parental rights was based solely on the actions of Douglas Williams. Respondent asserts that there was insufficient evidence to terminate her parental rights.

Under MCL 712A.19a(e); MSA 27.3178(598.19a[e]), a parent's rights may be terminated if the parent "is unable to provide a fit home for the child by reason of neglect". We have reviewed the record. There was overwhelming evidence that respondent was incapable of properly caring for her children and protecting them from harm.

Although respondent did not personally physically or sexually abuse the children, she permitted the continuance of an environment in which the children were likely to be continually abused. She knew that Angel, James, and a third, younger child born to the Williamses had been physically abused by Williams, and yet she continued living with him. Furthermore, despite the assistance of a public health nurse, a housekeeping assistant, and other support personnel provided by the DSS, respondent found it difficult to care for even one child. Insofar as James is concerned, respondent indicated at the dispositional hearing that she did not wish this child returned to her custody. Also, respondent's reaction to the allegation that Douglas Williams was sexually abusing Angel indicated

an extreme lack of sensitivity for the child's emotional well-being. Instead of supporting Angel's attempt to obtain help, respondent belittled her and, in fact, told her that she deserved to be unhappy as a result of her having told anyone about the sexual abuse. In sum, respondent's failure to protect her children from continuing physical and sexual abuse, her own insensitivity to her children's emotional needs, and her inability to properly care for the children on her own provided clear and convincing evidence for the termination of her rights.

Affirmed.