PEOPLE v KOSTERS

Docket No. 100128. Submitted April 20, 1988, at Grand Rapids. Decided March 20, 1989. Leave to appeal applied for.

Elroy L. Kosters was convicted of two counts of first-degree criminal sexual conduct following a jury trial in the Ottawa Circuit Court, Calvin L. Bosman, J. Defendant appealed alleging several errors.

The Court of Appeals *held:*

1. The trial court improperly admitted hearsay statements which one of the victims, defendant's five-year-old son, made to a nurse who interviewed him prior to examination by a physician. However, the error was harmless because the remaining evidence against defendant was overwhelming. In light of the direct and circumstantial evidence against defendant, the error in admitting the hearsay testimony of the nurse was harmless beyond a reasonable doubt, since no juror would have voted for acquittal.

2. The trial court properly admitted expert testimony comparing pubic hairs taken from defendant and those allegedly found in the diaper of the second victim, defendant's almost two-year-old daughter, following defendant's visitation with the child. The evidence was relevant and admissible because of its tendency to make the existence of other important facts more probable or less probable than it would be without the evidence.

3. The brief, inadvertent reference by a prosecution witness to defendant's having taken a polygraph was harmless. No prejudice resulted therefrom.

4. The prosecutor improperly questioned defendant as to his sexual orientation and preference. The questions were irrelevant and the trial court properly terminated this line of questioning. The trial court should have instructed the jury to disregard the answers; however, the failure to so instruct was not error requiring reversal because defense counsel did not ask for a curative instruction and defense counsel, on redirect

REFERENCES

Am Jur 2d, Appeal and Error §§ 623, 776-819, 884; Evidence §§ 264-266, 496, 1091; Trial § 266; Witnesses §§ 430, 471-506.

examination, elicited the same answers to the same questions. No prejudice resulted therefrom.

5. The trial court did not abuse its discretion in allowing the prosecutor to examine defendant's five-year-old son by leading questions.

6. The cumulative effect of the trial court's errors did not deprive defendant of a fair trial.

Affirmed.

W. R. PETERSON, J., dissented. It is his belief that the errors which occurred were not harmless beyond a reasonable doubt. While he believes that the trial court properly allowed the prosecutor to examine defendant's five-year-old son by leading questions, he disagrees that it was harmless error to admit the hearsay statement by the nurse who interviewed the child. In addition, he believes that the nurse's testimony was, in itself, so prejudicial as to mandate a retrial. He would also find the prosecutor's improper questioning of the defendant as to his sexual orientation and preference to be prejudicial prosecutorial misconduct. He would also find that the expert testimony concerning the pubic hairs was irrelevant and that, even if it had any relevance, such relevance was outweighed by its prejudicial effect. He would reverse.

1. WITNESSES — HEARSAY — MEDICAL TREATMENT EXCEPTION.
   The medical treatment exception to the hearsay rule does not apply to statements which were not reasonably necessary to medical diagnosis and treatment (MRE 803[4]).

2. CRIMINAL LAW — EVIDENCE — CIRCUMSTANTIAL EVIDENCE.
   Circumstantial evidence and reasonable inferences arising therefrom are sufficient to constitute satisfactory proof of the elements of a criminal offense.

3. APPEAL — CRIMINAL LAW — HARMLESS ERROR — REASONABLE DOUBT — JURY.
   Error is not harmless and a defendant must be retried if it is reasonably possible that in a trial free of the errors complained of even one juror might have voted to acquit the defendant; a conviction must stand if the proof was so overwhelming, aside from the taint of error, that all reasonable jurors would find guilt beyond a reasonable doubt.

4. EVIDENCE — RELEVANT EVIDENCE.
   Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence (MRE 401).

5. EVIDENCE — POLYGRAPHS.

The results of a polygraph test are not admissible as evidence; however, a brief, inadvertent reference to a polygraph is harmless; the mere mention of a polygraph by a witness is not grounds for a mistrial.

6. TRIAL — CROSS-EXAMINATION — RELEVANT EVIDENCE.

A witness may be cross-examined on any matter relevant to an issue in the case (MRE 611[b], MRE 401).

7. APPEAL — PRESERVING QUESTION.

A trial court's failure to instruct the jury to disregard the defendant's answers to irrelevant questions is not error requiring reversal where defense counsel fails to ask for a curative instruction and defense counsel, on redirect examination, elicits the same answers to the same questions.

8. WITNESSES — LEADING QUESTIONS — PROSECUTING ATTORNEYS — CHILDREN.

It is within the trial court's discretion to allow the prosecutor a fair amount of leeway in asking questions of young children called in his case in chief; leading questions may be used in the direct examination of a child to the extent necessary to develop the testimony in light of the child's age (MRE 611[c]).

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, *Wesley J. Nykamp*, Prosecuting Attorney, and *Gregory J. Babbitt*, Assistant Prosecuting Attorney, for the people.

*Catchick & Dodge* (by *David A. Dodge*), for defendant.

Before: WEAVER, P.J., and McDONALD and W. R. PETERSON,* JJ.

WEAVER, P.J. Following a jury trial, defendant was convicted of two counts of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2). For each count defendant received concurrent sentences of seven to thirty-five years in prison. He appeals as of right. We affirm.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Defendant was charged with the sexual abuse of his two children. His daughter was not yet two years old at the time of the alleged abuse, and his son was five. In addition to the testimony of defense witnesses, evidence at trial included the testimony of defendant's five-year-old son, Patricia McNees, a licensed practical nurse who interviewed the son before he was examined by a physician, Dr. Francis Banfield, the children's pediatrician, Dr. David Hickok, a medical expert in the area of child abuse, Margaret Kosters, defendant's ex-wife, and police involved in the investigation. Defendant testified in his own behalf.

I

On appeal, defendant asserts that the trial court improperly admitted hearsay statements which his son made to Nurse McNees. We agree that this testimony should have been excluded under MRE 803(4), since the statements were not reasonably necessary to medical diagnosis and treatment. See *People v Wilkins,* 134 Mich App 39, 43; 349 NW2d 815 (1984), lv den 422 Mich 862 (1985). However, the error was harmless because the remaining evidence against defendant was overwhelming.

Defendant's five-year-old son gave direct testimony against his father. Even though the child's testimony was at times inconsistent, it was credible and the jury believed it. In fact, in this particular case of multiple incidents of abuse over a period of time, the child's very inconsistency lends credibility to his testimony, since it tends to show that the boy was relying on his child's memory and was not delivering prelearned and adult-inculcated testimony.

The boy's testimony was explicit. The child testified that he saw his father put his finger into his

little sister's vagina, that while all three were in the bathroom defendant touched both the girl's and the boy's "privates" (groin and buttock area), and that defendant touched him with a nail in the genital area. It cannot reasonably be maintained that an adult touching a child's genitals with a nail is normally within the range of the imagination or experience of a five-year-old child. Young children like this five-year-old child do not often see, if ever, such things on television or read about them in books.

In addition to the child's direct testimony, there was also the testimony of defendant's ex-wife and the examining physician. The fact of sexual abuse was clearly shown as to both children. The examining physician testified to his findings of vaginal penetrations and injuries to defendant's daughter and of repeated anal penetrations to both children.

Further, the circumstantial evidence against defendant was strong. It is well established that circumstantial evidence and reasonable inferences arising therefrom are sufficient to constitute satisfactory proof of the elements of a criminal offense. *People v Frank Johnson,* 146 Mich App 429, 434; 381 NW2d 740 (1985), lv den 425 Mich 855 (1986).

The circumstantial evidence presented at trial indicated the unlikelihood that sexual injuries to the two children could have occurred while in their mother's custody because there had been no males in the house other than the maternal grandfather and, during the period in question, the children had not been out of the mother's presence except twice with a babysitter for only an hour. Moreover, defendant had the opportunity to commit the acts, particularly on three occasions, after which the mother observed a vaginal irritation on the daughter. Defendant told police that he had been alone with his daughter on one of these

occasions, and he also made statements both to police and to a friend tending to indicate his guilt.

In light of the direct and circumstantial evidence against defendant, the error of admitting the hearsay testimony of Nurse McNees was harmless beyond a reasonable doubt, since no juror would have voted for acquittal. *People v Christensen,* 64 Mich App 23, 32-33; 235 NW2d 50 (1975), lv den 397 Mich 839 (1976).

II

Defendant also argues that the trial court improperly admitted expert testimony comparing pubic hairs taken from defendant with those allegedly found in the diaper of defendant's daughter following defendant's visitation. We disagree with this contention. The pubic hair evidence did not need to be excluded because it tended to connect defendant with the crime and was admissible under MRE 401. See *People v Horton,* 99 Mich App 40, 49-51; 297 NW2d 857 (1980), vacated on other grounds 410 Mich 865 (1980), on remand 107 Mich App 739; 310 NW2d 34 (1981), lv den 418 Mich 942 (1984); *People v Goree,* 132 Mich App 693, 701; 349 NW2d 220 (1984); *People v Furman,* 158 Mich App 302, 327-328; 404 NW2d 246 (1987), lv den 429 Mich 851 (1987).

The instant case is clearly distinguishable from *People v Nichols,* 341 Mich 311; 67 NW2d 230 (1954). *Nichols* was a paternity case. Here, the pubic hairs were found immediately after defendant's visitation of June 18, 1986—which defendant admitted was one during which he had been alone with his daughter, and following which the mother observed a vaginal irritation on the child. Hence, unlike the situation in *Nichols,* the evidence showing that the pubic hairs could have

come from defendant was relevant and admissible because of its tendency to make the existence of other important facts more probable or less probable than it would be without the evidence. MRE 401.

### III

We also reject defendant's contention that it was error requiring reversal for a prosecution witness to state on cross-examination that defendant had taken a polygraph in conjunction with a previous sexual abuse charge.

In responding to defense counsel's request that she tell the jury when she had been advised by the Ottawa County Sheriff's Department that, in their opinion, the son had not been sexually abused by defendant, defendant's ex-wife replied: "When Elroy took the lie-detector test." Upon defense counsel's objection and the trial court's instruction, defendant's ex-wife rephrased her answer. The trial court offered a curative instruction, but defendant declined it when the court refused to advise the jury that he had passed the lie-detector test.

The results of a polygraph (lie-detector) test are not admissible as evidence in Michigan. *People v Frechette,* 380 Mich 64, 68; 155 NW2d 830 (1968). However, a brief, inadvertent reference to a polygraph is harmless. *People v Tyrer,* 19 Mich App 48, 51; 172 NW2d 53 (1969), app dis 385 Mich 484; 189 NW2d 226 (1971). The mere mention of a polygraph by a witness is not grounds for mistrial. *People v Paffhousen,* 20 Mich App 346, 351; 174 NW2d 69 (1969), lv den 383 Mich 825 (1970).

The answer of defendant's ex-wife was responsive to a poorly phrased question. Because the jury knew that the police did not charge defendant

following the earlier allegations, it is not reasonable to assume that the jury could have believed defendant did not pass the test. The matter was not mentioned again, either by the witness or by counsel. The reference to defendant's polygraph was brief and inadvertent and was therefore harmless. *Tyrer, supra.* No reversal is required because defendant shows no prejudice. See *People v Alvin Johnson,* 396 Mich 424, 436-437; 240 NW2d 729 (1976), reh den 396 Mich 992 (1976), cert den 429 US 951; 97 S Ct 370; 50 L Ed 2d 319 (1976).

IV

Defendant further contends that there occurred prosecutorial misconduct requiring reversal when the prosecutor questioned defendant as to his sexual orientation and preference. We are unpersuaded by this argument.

In Michigan, a witness may be cross-examined on any matter relevant to an issue in the case. MRE 611(b), MRE 401. Since there is no known connection between child abuse and the sexual orientation of those who sexually abuse children, the prosecutor's questions appear to have been irrelevant and the trial court correctly terminated this line of questioning.

The trial court should also have instructed the jury to disregard the answers. See *People v Stinson,* 113 Mich App 719, 726-727; 318 NW2d 513 (1982), lv den 417 Mich 957 (1983). However, failure to so instruct the jury was not error requiring reversal because (1) defense counsel never asked for a curative instruction and (2) defense counsel on redirect examination elicited the same answers to the same questions to which he had objected on cross-examination. Defense counsel's omission to request a curative instruction waived any error in

the trial court's failure to give such instruction. Because defendant shows no prejudice, reversal is not required. *People v Robinson,* 386 Mich 551, 562-563; 194 NW2d 709 (1972).

V

We also reject defendant's argument that the trial court abused its discretion in allowing the prosecutor to examine defendant's five-year-old son by leading questions. It was within the trial judge's discretion to allow the prosecutor a fair amount of leeway in asking questions of young children called in his case in chief. *People v Hicks,* 2 Mich App 461, 466; 140 NW2d 572 (1966). Our review of this matter shows that the prosecutor's direct examination was no more leading than necessary given the age of the witness and his uneasiness. The prosecutor's questions were only leading to the extent necessary to develop the witness's testimony in light of his age. MRE 611(c).

VI

Defendant's final argument is that the cumulative effect of the trial court's errors was to deprive defendant of a fair trial. We disagree.

The trial court's error of allowing the hearsay testimony of Nurse McNees was harmless, as was the brief and inadvertent mention of defendant's having taken a polygraph. Regarding the court's failure to give a curative instruction following improper prosecutorial questioning as to defendant's sexual orientation, defense counsel waived objection by failing to request a curative instruction and by proceeding with the same line of questioning himself.

These three errors taken together cannot be said

cumulatively to have denied defendant a fair trial. See *People v Smith,* 158 Mich App 220, 225; 405 NW2d 156 (1987), lv den 428 Mich 903 (1987). In light of the five-year-old son's credible direct testimony, the examining physician's uncontroverted evidence of actual sexual abuse, and numerous pieces of circumstantial evidence including but not determined by the pubic hairs, the evidence against defendant was so overwhelming that no reasonable juror would have voted for acquittal.

Affirmed.

McDONALD, J., concurred.

W. R. PETERSON, J. *(dissenting).* I am unable to say that the errors which occurred herein were harmless beyond a reasonable doubt. Indeed, I view one error as so prejudicial as to require reversal in itself.

No case could more clearly demonstrate our problems in attempting to deal with the sexual abuse of small children in the traditional context of a criminal prosecution. The children here involved were defendant's son and daughter, who, following a bitter separation and divorce, were with defendant only for periodic visitation. That they had been subjected to acts of sexual depravity was clear. The medical evidence established vaginal penetrations and injuries to defendant's daughter, and both children showed physical effects of repeated anal penetrations. It was the prosecution's claim that such abuse was perpetrated on the children during visitations with defendant.[1]

---

[1] Defendant's ex-wife had instigated a previous investigation of alleged sexual abuse by defendant of their son, which investigation was dropped for lack of evidence and in the course of which defendant passed a polygraph examination. Reference to the "lie-detector test" by the ex-wife has been raised as a ground for appeal but I find no error. The reference was clearly inadvertent and in a context in

Defendant's daughter was not yet two years of age and was not a witness. Defendant's son was five years old and was a witness. The questionable competency of children as witnesses is recognized by a statute[2] which requires that the trial court make special examination when a child under the age of ten years is produced as a witness to determine whether the child "has sufficient intelligence and sense of obligation to tell the truth to be safely admitted to testify."[3]

Defendant does not claim error in the trial court's decision to allow his son to testify. He does contend, however, that, given the susceptibility of such a young child to give an answer wanted by the questioner, the trial judge erred in allowing the use of leading questions by the prosecutor. The record shows that a number of leading questions

which it had to be apparent to the jury that defendant had passed the test so that there could have been no prejudice to him by the reference. *People v Alvin Johnson,* 396 Mich 424; 240 NW2d 729 (1976).

[2] MCL 600.2163; MSA 27A.2163. And see *Washburn v People,* 10 Mich 372 (1862); *McGuire v People,* 44 Mich 286; 6 NW 669 (1880); *People v Beech,* 129 Mich 622; 89 NW 363 (1902); *People v Minchella,* 268 Mich 123; 255 NW 735; 93 ALR 805 (1934). Whether the statute has been overridden by MRE 601 has not been considered since the adoption of the Rules of Evidence [cf. *James v Dixon,* 95 Mich App 527; 291 NW2d 106 (1980)], but MRE 601 clearly contemplates that the trial court must consider competency in this and other situations involving mental capacity.

[3] Concerns as to whether a young child may be a competent witness involve many factors which go both to the capacity to recall and recount accurately and completely (i.e., susceptibility to false suggestion, memory, vocabulary, imagination, attention span, fear and timidity) and the capacity to make moral and practical judgments as to truthfulness and the significance of the facts regarding which the testimony is sought.

It has been suggested that judicial concern about the competency of young children to be witnesses lies less in a fear of inaccuracy than in a distrust of a jury's ability to assay such testimony. McCormick, Evidence (3d ed), § 62, p 156. If so, perhaps the emphasis is wrong; and, how to explain the dearth of reported cases in which child witnesses are disqualified from testifying. It virtually never happens. Weihofen, *Testimonial Competence and Credibility,* 34 Geo Wash L Rev 53 (1965).

were asked, but in only one instance was an objection specifically made on that ground.[4] In that instance, the question repeated a prior statement of the witness and seems to have been a transitional question intended to return the attention of the witness to that particular subject. Subsequently, defense counsel asked to place a continuing objection to leading questions, but the direct examination of the witness was completed shortly thereafter and defendant points out no instances of leading questions after the general objection.

MRE 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." The rule is consistent with earlier Michigan decisions recognizing the discretion of the trial court in allowing leading questions. Young witnesses have been said to represent the classic situation where leading questions are appropriate. 3 Weinstein, Evidence, § 611(05), p 611-80; *People v Kratz,* 230 Mich 334, 340; 203 NW 114 (1925). That would be particularly true where, as with some of the leading questions here, the purpose is to focus the memory and concentration of a timid or distracted witness on a particular time, place or event. That is not to say that there may not be a fine line between those aims and the risk of false suggestion,[5] but MRE 611(c) leaves it to the trial judge to balance the need to draw evidence from the witness against the risk that the testimony in response to leading questions might be inaccurate. I cannot say on this record that the trial judge herein abused his discretion in that regard.

---

[4] In another instance, to a question that was leading, an objection was made on other grounds, the overruling of which was not erroneous.

[5] See *Coon v People,* 99 Ill 368, 370 (1881).

The course of the trial, however, shows the legitimacy of the concerns that exist about the competence of young children to testify, particularly the fear that words might be put into their mouths, not only by leading questions during trial but by pretrial suggestion.

The son's testimony about his father's conduct was primarily couched in terms of "touching," sometimes demonstrated by using a doll, and using the word "private" to designate the genitals and the word "butt" apparently having a dual meaning of either buttocks or the area of the anus, the particular meaning not always being clear from the record. That part of his testimony tending to show defendant's guilt may thus be summarized as follows: On an unspecified Sunday, the children were at defendant's house; the son carried a ladder from the garage to the side of the house and climbed it to look in the bathroom window; the son saw defendant put his finger in the daughter's "private"; later that day both children were in the bathroom with defendant and, after the son had gone to the bathroom, defendant touched his son on his "private" before zipping up his son's pants and also put his hand inside his son's butt and touched his daughter (indicating the groin and buttock area); defendant had once touched his son (indicating the genital area) with a nail and had touched his daughter with a nail also; and no one else had ever touched the son the way defendant touched him.

The testimony of the son was the only direct evidence bearing on defendant's guilt. His testimony was supported by circumstantial evidence: (1) that defendant had the opportunity through his visitation rights to commit the acts, particularly on three occasions, June 18, June 21 and June 24, 1986; (2) that, after each of these visitations with

defendant, the mother observed a vaginal irrita-
tion on the daughter; (3) that after the June 18
visitation with defendant (a) the mother changed
the daughter's diaper and found two hairs resem-
bling pubic hairs therein, which hairs were later
delivered to the police, and (b) which hairs an
expert compared with and found similar to hairs
taken from defendant, and (c) that defendant told
a detective that he had been alone with his daugh-
ter during the June 18 visitation; (4) that it would
be unlikely that the injuries to the children could
have occurred while in their mother's custody
because there were never any males in the house
other than the maternal grandfather, and that
during the last half of June the children had been
out of the mother's presence only twice and then
with a female babysitter for only an hour; (5) that
defendant had made statements tending to indi-
cate guilt to a detective to the effect that he did
not remember doing anything like he was accused
of doing and asking if it was possible to do some-
thing like that and not remember it; (6) that
defendant made statements to a friend, when dis-
cussing the charges, to the effect that even if he
did it people were acting like it was the most
terrible thing that could happen; and (7) that
hearsay statements were attributed to the son as
to defendant's acts, primarily offered through the
testimony of Patricia McNees.

The testimony of defendant's ex-wife was that on
June 26, 1986, she went to the police with her
suspicions and the hairs which she said she had
found in the daughter's diaper on June 18. A
detective advised her to take her daughter to a
pediatrician, which she did the same day. The
pediatrician, Dr. Banfield, had previously exam-
ined the daughter in connection with the ex-wife's
prior complaint of sexual abuse by defendant and

on that occasion found no evidence to substantiate the complaint. On June 26, however, he did find the physical evidence noted above and referred her to Dr. David Hickok at the Southwest Michigan Health Education Center (SMHEC). Dr. Hickok saw the daughter the following day, June 27, and testified to his physical findings.

Defendant's ex-wife also testified that sometime thereafter in late June, and after she had questioned the son about his father, the son told her for the first time about defendant's acts. On July 1, the son was interviewed by a detective and the interview was video taped, but he gave no information indicating sexual abuse by defendant.[6] On July 18, the son was taken to the SMHEC clinic to be examined by Dr. Hickok, and Dr. Hickok testified to his findings indicative of repeated anal penetration. It was on this occasion that the son was interviewed by a practical nurse, Patricia McNees.

McNees testified that she had talked to defendant's ex-wife before talking to the son. She was aware of the nature of the ex-wife's accusations against defendant and of an incident related to the prior complaint by the ex-wife against her husband in which she claimed that the son had tried to put his penis into his sister's mouth and said he did it because that was what daddy did.[7] After some general questions, McNees told the son about touches, good and bad, although in explaining who gave good touches she left out daddies. She also

---

[6] The so-called "protective services video" was offered in evidence. While the video portion could be seen, the audio portion was defective and could not be heard.

[7] Defendant's ex-wife testified to this incident. McNees testified that she asked the son about such an act and he denied it, that she persisted, saying, "He did it before, didn't he? Did he do it this time too? What did he put in your mouth?" The son answered, "I don't know," and became upset.

explained that bad touches could be inside or outside clothes. She then obtained the son's statements that defendant had given him bad touches inside his clothes or when his clothes were off, that it happened in the bedroom, that defendant did not have any clothes on, that defendant touched his (the son's) bottom and made it wet, that he wiped his bottom with toilet paper, and that what was on it was white and slimy. The son also told McNees that defendant once touched his "pee pee" with a nail. Later, McNees asked the son if it "hurt when he did that to you," and he said yes. Repeated questions to the son about how defendant touched him and his sister produced uncertain, nonverbal or no responses. McNees finally asked the son if his dad had asked him not to tell anyone, to which he replied, "yes." McNees then drew statements from the son that his dad would get mad and would spank him.

A pretrial motion to exclude the testimony of McNees as hearsay was denied. The motion was renewed at trial and was again overruled. It is the contention of the prosecution that the testimony, though hearsay, was admissible under MRE 803(4), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> *       *       *
>
> (4) *Statements made for purposes of medical treatment or medical diagnosis in connection with treatment.* Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

MRE 803(4), as originally proposed, followed § 803(4) of the Federal Rules of Evidence verbatim, representing an almost complete reversal of Michigan precedent.[8] As ultimately adopted by our Supreme Court, 402 Mich lxxxviii et seq. (1978), MRE 803(4) was somewhat less broad than FRE 803(4) in not extending the relaxation of the hearsay exclusion to statements made solely for purposes of diagnosis and in one other particular that is significant to cases such as this.

MRE 803(4) removes the bar to admission as to three kinds of hearsay statements: (1) medical history; (2) past or present symptoms, pain or sensation; and (3) the inception or general character of the cause or external source thereof. It does so upon two requirements. In order to justify the admission of the out-of-court statement, its proponent must establish, first, that the statement was made for a particular purpose, i.e., for medical treatment or for medical diagnosis in connection with treatment, and, second, that the statement was reasonably *necessary* to such diagnosis and treatment. In this second requirement, the Michigan rule is more restrictive than the federal rule, which only requires that the statement be reasonably *pertinent* to diagnosis or treatment.

The rationale of the rule lies in the first requirement and is founded upon the belief that a person seeking medical treatment has a "motive to disclose the truth because his treatment will in part depend upon what he says."[9] If this be true, the statement should be considered to be sufficiently

---

[8] Prior to the adoption of the Michigan Rules of Evidence, hearsay statements of medical histories, past pain or symptoms, and causes thereof were inadmissible. Hearsay statements of contemporaneous condition by the declarant were admissible except when made to the physician for purposes of litigation. See the Committee notes.

[9] *Meaney v United States*, 112 F2d 538, 540 (CA 2, 1940).

trustworthy to be considered by the finder of fact.[10]
The origin of the second requirement, that the
statement be reasonably ("pertinent," FRE; "nec-
essary," MRE) to such diagnosis ("or," FRE; "and,"
MRE) treatment, is more obscure. It is an objective
test focusing on the medical relevance of the state-
ment rather than on its relevance to an issue at
trial and is seemingly unrelated to the first re-
quirement, which focuses on the state of mind of
the declarant.[11]

Statements describing the inception, cause or
external source of symptoms, pain or sensation
which enter the realm of attributing fault would
seem to be inadmissible under MRE 803(4) for
three reasons: (1) the rule allows only statements
about the *general* character rather than of the
*specific* character of the cause;[12] (2) statements
fixing fault are not generally motivated by the
purpose of obtaining medical treatment;[13] and (3)
such statements, from the objective viewpoint of

[10] This view, of course, had been rejected by Michigan prior to the
adoption of the Michigan Rules of Evidence. *Lacas v Detroit City R
Co,* 92 Mich 412; 52 NW 745 (1892). See generally 6 Wigmore,
Evidence (Chadbourn rev), §§ 1719-1720, pp 103-113.

[11] There are frequent statements to the effect that hearsay deemed
sufficiently reliable to be depended upon in diagnosis and treatment
ought to be sufficiently reliable to be considered as evidence, e.g., 4
Weinstein, Evidence, § 803(3)[5], p 803-129; *United States v Iron Shell,*
633 F2d 77 (CA 8, 1980), but that is a non sequitur probably borrowed
from cases dealing with business records and opinion exceptions to
the hearsay rule such as for a laboratory or x-ray report relied upon
by the treating or diagnosing physician and offered under MRE
803(6), or relied upon by an expert witness under FRE 703 which,
contrary to MRE 703, allows the expert to rely on facts or data which
need not be admissible in evidence.

[12] "Thus a patient's statement that he was struck by an automobile
would qualify but not his statement that the car was driven through
a red light." Advisory Committee's Note, FRE 803(4).

[13] In *United States v Narciso,* 446 F Supp 252, 289 (ED Mich, 1977),
the court held that a declarant's statement as to who was responsible
was not for the purpose of treatment but was, to the contrary,
accusatory in nature, thus lacking the inherent reliability of a state-
ment made for the purpose of obtaining treatment.

the practice of medicine, would seem to be irrelevant to treatment and diagnosis.[14]

In *United States v Nick,* 604 F2d 1199 (CA 9, 1979), and *United States v Iron Shell,* 633 F2d 77 (CA 8, 1980), cert den 450 US 1001 (1981), statements made to physicians by small children as to sexual assaults inflicted upon them were held admissible under FRE 803(4). The court in *Iron Shell,* describing the basis of the rule, stated:

> A two-part test flows naturally from this dual rationale: first, is the declarant's motive consistent with the purpose of the rule; and second, is it reasonable for the physician to rely on the information in diagnosis or treatment. [*Id.,* p 84.]

The court, however, also went on to say:

> It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related.[15] [*Id.,* p 84.]

Four Michigan cases have considered the appli-

[14] *Bradbury v Ford Motor Co,* 123 Mich App 179, 187; 333 NW2d 214 (1983); *Roberts v Hollocher,* 664 F2d 200 (CA 8, 1981).

[15] The statements recounted in *Nick* and *Iron Shell* did not identify the assailant. Consistent with this dictum in *Iron Shell,* hearsay statements as to the identity of an assailant have been excluded under FRE 803(4) or similar state rules either because such information is not "sufficiently related" (reasonably pertinent) to medical diagnosis and treatment or because the statement was not made by the declarant for the purpose (with the motive) of obtaining medical treatment. See *State v True,* 438 A2d 460 (Maine, 1981); *Hassell v State,* 607 SW2d 529 (Tex Crim App, 1980); *State v Brubaker,* 184 Mont 294; 602 P2d 974 (1979); *State v Jeffers,* 135 Ariz 404; 661 P2d 1105 (1983); *United States v Narciso, supra.*

Contra, *State v Bouchard,* 31 Wash App 381; 639 P2d 761 (1982), a case similar to *People v Wilkins,* 134 Mich App 39; 349 NW2d 815 (1984), and *Goldade v State,* 674 P2d 721 (Wy, 1983), cert den 467 US 1253 (1984), where, in a split decision, defendant's conviction, based solely on the testimony of a physician as to statements made by a child who had been held incompetent to testify, was affirmed.

cation of MRE 803(4) to statements in which the declarant-victim identified his or her assailant. In *People v Wilkins,* 134 Mich App 39; 349 NW2d 815 (1984), lv den 422 Mich 862 (1985), a nine-year-old girl told a doctor at the Family Assessment Clinic at Michigan State University of a history of sexual abuse by her stepfather, who was prosecuted and convicted therefor. The testimony of the doctor recounting those statements was upheld as conforming to the two-part test described in *Iron Shell.* The Court rejected the contention that statements which identified the defendant as the perpetrator of the acts were not *reasonably necessary* to diagnosis and treatment. The opinion is unclear as to the evidentiary foundation for the conclusion that such statements were reasonably necessary for diagnosis and treatment, but it appears that there was evidence of psychological damage to the victim since treatment included referral to a child psychologist. The Court found that the identification of a family member as a source of the sexual abuse was necessary to adequately diagnose and treat the impact of the sexual abuse on the child.[16]

*In re Rinesmith,* 144 Mich App 475; 376 NW2d 139 (1985), lv den 424 Mich 855 (1985), an appeal from a probate court's termination of parental rights, was decided in reliance on *Wilkins* and likewise turned on the question of whether a statement of a child, identifying her father as the

---

[16] The Court also spoke of recommended removal of the child from the home as "part of the treatment," though it may be questioned whether this constitutes "medical treatment." See also *United States v Renville,* 779 F2d 430 (CA 8, 1985), *State v Smith,* 315 NC 76; 337 SE2d 833 (1985), and *State v Aguallo,* 318 NC 590; 350 SE2d 76 (1986).

*Wilkins* and similar cases from other jurisdictions have been the subject of criticism. "Concern over the recent revelations of child sex abuse have caused several state courts to expand, if not distort, the concept of diagnosis or treatment." Graham, Handbook of Federal Evidence (2d ed, 1986), § 803.4, p 828, n 4.

cause of pain in her "pee pee," was reasonably necessary for diagnosis and treatment. While *Wilkins* at least made some sparse reference to the foundation made in the trial court to establish that the statement was reasonably necessary to medical diagnosis and treatment, *Rinesmith* is totally devoid of reference to such evidence. In fact, *Rinesmith* seems to confuse reasonable necessity from the medical viewpoint with the state of mind of the declarant child.[17]

In *People v Zysk*, 149 Mich App 452; 386 NW2d 213 (1986), a nurse testified to the account of sexual assault made by the victim on admission to a hospital emergency room for treatment, which account included an identification of defendant as her assailant. In reliance on *Wilkins,* this Court rejected the defendant's argument that the statement was not "reasonably pertinent."[18] Again, the adequacy of the medical necessity foundation for use of the statement is suspect, apparently consisting solely of the assertion of the nurse that getting the victim's account was very important in the treatment of the victim. The *Zysk* Court suggested, without discussion, that it may have been error to admit that part of the statement identifying defen-

---

[17] "Angel suffered internal pain. Angel had been brought to Dr. Daniel's office on a prior occasion in the company of her parents and DSS personnel. Angel could, therefore, logically conclude that Dr. Daniel was in a position to help her in regard to physical problems arising out of problems within her family. Angel could look to Dr. Daniel not only to alleviate the immediate pain but to take some action to intervene and prevent the pain from recurring in the future. Viewed in this light, revelation of the fact that the pain was caused by sexual abuse and that that abuse was inflicted by a member of her family was reasonably necessary to obtain relief." *Rinesmith,* p 479. Angel was four years old.

[18] Defendant posed his argument using the language of FRE 803(4) rather than the "reasonably necessary" language of MRE 803(4), an error which the *Zysk* opinion did not note or correct, an oversight perhaps induced by language in *Wilkins,* quoted at p 457 of *Zysk,* that "it must be reasonable," rather than reasonably necessary, "for the physician to rely on the information in diagnosis and treatment."

dant as the attacker but said that, if so, the error was not prejudicial to defendant since his identification was never at issue.

*In re Freiburger,* 153 Mich App 251; 395 NW2d 300 (1986), was a parental rights termination appeal wherein the appellant-father allegedly sexually abused his daughter. A "psychiatric social worker" was allowed to testify to nonverbal hearsay, a demonstration using so-called anatomically correct dolls, by the daughter as to her father's acts and such testimony was held admissible under MRE 803(4) and *Wilkins.* Again, the opinion is troubling because of its failure to discuss whether there was evidence in the record demonstrating that the child had problems requiring medical treatment, whether that was the purpose for which the statement was made,[19] whether the act described was a cause of the condition requiring treatment, and whether the obtaining of the statement was reasonably necessary for medical treatment. A dissent by Judge BORRADAILE noted this lack of foundation and the absence in the record of evidence about the "psychiatric social worker," her qualifications and whether her work bore any relation to medicine. The majority opinion, at 257, rejected the claim that to be admissible under MRE 803(4) the hearsay statement must be made to a physician.[20] But, while this may be true in any given case, that is not to say that the other requirements need not be met, nor does it follow that the non-physician is qualified to testify to the foundation required to establish reasonable medical necessity for the statement for medical treatment and diagnosis.

---

[19] As in *Rinesmith,* the opinion seems to mingle the concepts of the declarant's motive and of medical necessity for treatment, getting into the motives of the questioner.

[20] Citing *Galli v Reutter,* 148 Mich App 313; 384 NW2d 43 (1985), and Advisory Committees Note to FRE 803(4).

These cases, then, affirm the use of hearsay statements under MRE 803(4), but, because of the way in which questions were raised on appeal, they leave much unsaid or assumed. There is a further question which has not been addressed in any of those cases and that is whether the statement itself is of such a nature as to qualify for admission: Is the statement one of inception or general cause or external source *of a past or present symptom, pain or sensation*? That the question was not discussed in *Zysk* and *Rinesmith* is probably because injury or pain, contemporaneous with the statement of cause, were obvious. In *Wilkins* and *Freiburger,* however, one is hard put to guess what past or present symptom, pain or sensation existed for which the accusatory statement could attribute a cause.

In summary, before a hearsay statement is found to be admissible under MRE 803(4), the proponent thereof has the burden of laying a foundation by which the trial judge, pursuant to MRE 104(a),[21] may determine the questions preliminary to admission: (1) Is the content of the statement of the qualified nature, i.e., one of medical history, or of past or present symptoms, pain, or sensations, or of the inception or general character of the cause or external source thereof? (2) Did the declarant make the statement for the purpose of medical treatment or medical diagnosis in connection with medical treatment? (3) Does the information meet the objective medical test of being reasonably necessary to medical diagnosis and treatment?

In the instant case, none of these things was

---

[21] *State v Brubaker,* 184 Mont 294; 602 P2d 974 (1979). I note that the offer of proof on the preliminary questions should ordinarily, under MRE 104(c), be conducted out of the presence of the jury. *People v Creith,* 151 Mich App 217, 227; 390 NW2d 234 (1986).

established. The statements made to Nurse Mc-
Nees by the son do not fall within any of the
categories of qualified statements either about his
own medical condition or about that of his sister.
It is clear that the son had absolutely no idea that
what he was telling Nurse McNees might result in
medical treatment either for him or for his sister,
and so the assumed truthful motive in giving facts
for the purpose of medical treatment is absent.
Neither was there any evidence whatever that the
information was reasonably necessary for medical
treatment and diagnosis. In fact, the testimony of
the referring pediatrician, Dr. Banfield, and that
of Nurse McNees tended to show that the purpose
of the interview had nothing to do with diagnosis
and treatment but was, rather, for the purpose of
gathering evidence of criminal conduct,[22] and no
treatment was ever undertaken so far as this
record shows. The testimony of Nurse McNees was
inadmissible hearsay.

I cannot agree with my colleagues that the
receipt into evidence of this hearsay was harmless
error. To say that there was overwhelming circum-
stantial evidence of guilt ignores the fact that the

---

[22] Dr. Banfield testified that defendant's daughter was referred to
the clinic because Dr. Hickok was a specialist in child abuse whose
testimony in court would be given greater weight than what he (Dr.
Banfield) would say. He also testified that the referral was for evalua-
tion and not for treatment and that he had no knowledge of any
treatment plan for the daughter.

While Nurse McNees said that the purpose of her interview was to
focus the subsequent physical examination by Dr. Hickok and to
formulate a medical treatment plan and also for possible referral for
counseling, one may question the credentials of a practical nurse to
provide the foundation of objective proof of medical necessity. She
also testified to a mistaken interpretation of the Child Protection Act,
MCL 722.621 et seq.; MSA 25.248(1) et seq., which she thought
compelled her to obtain evidence of abuse and the identity of the
abuser.

Dr. Hickok gave no testimony bearing on the medical necessity of
such information or to indicate that there was any contemplated
treatment.

thrust of that circumstantial evidence was merely to prove defendant's opportunity to commit the offenses because he exercised his parental visitation rights and because, if defendant's ex-wife is to be believed, no one else could have had the opportunity to commit the offenses—a conclusion which, even if her credibility is assumed, she might believe but could not know of her own personal knowledge. The testimony of the son was the only direct evidence of defendant's guilt. That testimony was inconsistent, sometimes downright contradictory, even on direct examination and despite the guidance of leading questions. While that may not be surprising in the testimony of a five-year-old child, I cannot agree that inconsistency is proof of credibility. Which of the inconsistent statements is thus rendered more credible, that which suggests guilt or that which suggests innocence? To say that the son was credible and that the jury believed him begs the question. The question, rather, is whether the jury may have been led to believe his incriminating testimony because of the erroneously admitted hearsay.

> We must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction", that is, whether it might have aided in convincing an otherwise undecided juror of the defendant's guilt beyond a reasonable doubt. If it is reasonably possible that, in a trial free of the error complained of, even one such jury member might have voted to acquit the defendant, then the error was not harmless, and the defendant must be retried. [*People v Swan*, 56 Mich App 22, 33; 223 NW2d 346 (1974).]

Entirely apart from other error herein, the testimony of Nurse McNees was so prejudicial as to

mandate retrial. Her testimony did more than corroborate the son's testimony. She recounted events about which he did not testify, events which may well have carried greater weight with the jury than did his testimony. And, if the testimony of young children is facially of questionable competence, it is not rendered more trustworthy by its secondhand rendition. The peril is not alone in the usual frailties of hearsay, but also that the words on repetition may be accorded greater weight and credibility because they are heard from a witness who is everything the child is not; mature, responsible, professional, expert, of good memory, seemingly detached, objective and impartial. The qualities of credibility attached to the relayer of the words may be attributed to the words themselves.[23]

Two other claims of error must be considered. One involves improper prosecutorial conduct by questioning defendant so as to suggest that he had a natural preference for sodomy. On objection, the prosecutor conceded that he had no evidence that defendant engaged in anal sex or homosexual conduct. The insinuation of unfounded prejudicial innuendo on cross-examination is not merely an

---

[23] A further concern about the hearsay statements of young children is apparent when the out-of-court statements are not spontaneous but result from a systematic or professional interrogation about the subject matter of litigation. The potential for false suggestion which is a peril of leading questions is obviously greater when the questioning is done without court or equivalent supervision and safeguards.

A child psychiatrist testified for the defense herein and expressed the opinion that McNees' interview was so slanted and suggestive that not only were the statements obtained from the son unreliable but that any statements he might make thereafter would be contaminated by ideas planted by McNees, an effect which might be cumulative or reinforced by similar interrogation of the child by other persons before or after the McNees interview. It is, perhaps, a peril similar to that which is of concern in cases where adult witnesses have been hypnotized. Cf. *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982).

irrelevancy but a matter of prosecutorial misconduct. The fact that defendant denied the insinuation both in response to the cross-examiner and on redirect examination *does not render the misconduct nonprejudicial. People v Ball,* 33 Mich App 288; 189 NW2d 816 (1971).

Neither do I agree with my colleagues on the admissibility of the so-called expert testimony of the state police laboratory specialist. He testified that he compared the hairs which defendant's ex-wife said she found in the daughter's diaper with hair specimens taken from defendant, that microscopic examination showed that the specimens were similar in that they were characteristic of Caucasian pubic hairs, and that, therefore, they could have come from the same source. He acknowledged that he could not say that there was any certainty or probability that they came from the same source. Timely and appropriate objection was made to that testimony, which objection should have been sustained under MRE 702, MRE 401 and MRE 403.

Under MRE 702, if the trial court determines that recognized scientific, technical, or other specialized knowledge does exist in a given field, it may allow an expert to testify as to his findings or opinion if that knowledge will assist the trier of fact either to understand the evidence or to determine a fact in issue. The threshold question of the state of scientific expertise in hair comparison under the *Frye-Davis* test[24] was not raised at trial or on appeal. Assuming the validity of such testing, it was appropriate for the witness, on proper foundation, to describe the hairs as being Caucasian pubic hairs, for that knowledge would help

[24] *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923); *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955). And see *People v Young,* 418 Mich 1; 340 NW2d 805 (1983).

the trier of fact to understand the testimony about the finding of such hairs. Beyond this, however, there was no further role for the expert. To say that the hairs could or might be from defendant is not necessary to help a jury understand the evidence and does not determine that the hairs were from defendant, the fact in issue.

If that testimony has any relevance at all, that relevance is outweighed by the prejudicial effect of superficial scientific testimony from a witness characterized as an expert. As such, it should be excluded under MRE 403.

Various panels of this Court have demonstrated some inconsistency in the consideration of circumstantial evidence of identity from so-called scientific comparison tests of hair, blood and semen and as to what, if any, proof of probability is required to make such evidence admissible. See, e.g., *People v Sturdivant,* 91 Mich App 128; 283 NW2d 669 (1979), lv den 407 Mich 933 (1979); cf. *People v Horton,* 99 Mich App 40; 297 NW2d 857 (1980); *People v White,* 102 Mich App 156; 301 NW2d 837 (1980); *People v Camon,* 110 Mich App 474; 313 NW2d 322 (1981); *People v Hayden,* 125 Mich App 650; 337 NW2d 258 (1983); *People v Goree,* 132 Mich App 693; 349 NW2d 220 (1984); *People v Furman,* 158 Mich App 302; 404 NW2d 246 (1987), lv den 429 Mich 851 (1987).[25]

It is not necessary, however, to engage in the dialogue on degrees of probability, for no evidence of probability was shown here. However, I must disagree with *Horton, Goree,* and *Furman* that *any* evidence suggesting the *possibility* of identity is admissible under MRE 401. MRE 401 defines "relevant evidence" as "evidence having any ten-

[25] And see *United States v Massey,* 594 F2d 676 (CA 8, 1979); *State v Carlson,* 267 NW2d 170 (Minn, 1978); *State v Scarlett,* 121 NH 37; 426 A2d 25; 23 ALR4th 1192 (1981).

dency to make the existence of any [material] fact
. . . more probable or less probable than it would
be without the evidence." Evidence that suggests
neither a greater nor lesser probability does not
meet that definition and is irrelevant. That was
the law prior to the adoption of MRE 401 and still
is. *People v Nichols*, 341 Mich 311; 67 NW2d 230
(1954), held that blood test evidence which showed
that a particular man *could* be the father of a
child had no tendency to prove or disprove pater-
nity and was therefore irrelevant and inadmissi-
ble.[26] As to the suggestion that *Nichols* is distin-
guishable because it is a paternity case, I know of
no authority to suggest that the rules of evidence
or the logic of relevancy is different in paternity
cases than in criminal sexual conduct cases. Other
evidence about the hairs can no more transform
the expert's "possibility" to a probability than
could the testimony of the complainant in *Nichols*
that she had sexual relations with Mr. Nichols at
a time coincident with conception.

I would reverse.

---

[26] See also the dissent in *People v Ledura Watkins,* 406 Mich 954
(1979), and the concurring opinion of Justice Boyle in *People v
Young,* 418 Mich 1; 340 NW2d 805 (1983), that if the blood tests there
involved were established as scientifically reliable, there would still be
a relevance question to be resolved.